UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 15-10222-GAO

UNITED STATES OF AMERICA,

v.

ILIR BREGU, MARIO SCATA, and MANUELE SCATA,
Defendants.

OPINION AND ORDER
April 21, 2017

O'TOOLE, D.J.

The defendants, Ilir Bregu, Mario Scata, and Manuele Scata, are charged with conspiracy to possess with intent to distribute and to distribute oxycodone in violation of 21 U.S.C. § 846. The Scatas are also charged with possession with intent to distribute and to distribute oxycodone in violation of 21 U.S.C § 841(a)(1), and Manuele[1] is further charged with using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Bregu and Manuele have moved to suppress evidence they contend was collected in violation of the Fourth Amendment.

## I.  Factual Background

According to the submissions, the government has developed its evidence against the defendants in large part through (1) a series of orders and search warrants obtained from March through June 2015 which permitted access to precise location data of certain cellular telephones and (2) July 2015 search warrants for vehicles and the Scatas' residence. Particularly at issue are search warrants issued by magistrate judges on March 20, 2015, to obtain precise location

---

[1] For clarity, this Opinion and Order identifies the Scatas by their first names.

information for cellular telephone number 609-510-5912 (the "5912 cellular telephone") associated with Bregu, and on July 14, 2015, to search Bregu's Lincoln Town Car and Manuele's Chevrolet Tahoe.

 A.  Search Warrant Application for 5912 Cellular Telephone

On March 20, 2015, at 12:27 p.m., a magistrate judge issued a warrant for government agents to obtain, among other things, specific latitude and longitude or other precise location information from the 5912 cellular telephone. The affidavit submitted in support of the warrant application by a special agent of the Federal Bureau of Investigation averred the following relevant facts:

Beginning in July 2012, a confidential informant ("CI-1") reported to the FBI that Ilir Bregu and Floart Mino were selling prescription pills, such as OxyContin and/or oxycodone, which they acquired from a source in New York and transported by vehicle to Massachusetts.[2] The special agent identified Bregu as a resident of New York and Mino as a resident of Massachusetts.

In May 2013, an FBI investigation into Bregu and Mino led to the arrest of Alwyn Kalligheri for possession with intent to distribute oxycodone. Kalligheri reported after his arrest that he worked at D&M Auto Doctor ("D&M"), an automobile repair facility owned by Manuele Scata, and sold oxycodone to the facility's customers. He stated that he had Manuele's permission to sell the pills but Manuele was not involved in the sales. He further stated that Mino was his pill supplier and that Mino's source was located in New York. Kalligheri subsequently pled guilty to the state drug charges.

In September 2014, a local police confidential informant ("CI-2") advised that he knew Mario Scata and that Mario had been illegally selling pills for years. He provided Mario's cellular

---

[2] CI-1 was later charged federally with the distribution of cocaine.

telephone number. The special agent determined that Mario was Manuele's father and was frequently at D&M. Toll records associated with the known telephone numbers used by Kalligheri, Mino, Manuele, and Mario showed that they all had direct telephone contact with each other in the months prior to Kalligheri's arrest. A review of toll records in the fall of 2013 showed that both Kalligheri, then on pre-trial release, and Manuele had direct telephonic contact with Bregu during that time.

In December 2014, the FBI installed a pole camera outside of a multi-family residence in Revere, Massachusetts. Surveillance showed that Mario resided in the basement apartment. In January 2015, surveillance showed vehicle traffic at the Revere residence consistent with street-level drug trafficking activity. That is, vehicles would frequently park at the driveway entrance or in the street nearby, the driver or passenger would then walk down the driveway toward Mario's basement apartment and return to the vehicle usually within a few minutes, and then the vehicle would leave. Additionally, some individuals were observed to be repeat visitors.

On February 3, 2015, as revealed by surveillance, a black Lincoln Town Car registered to Bregu at an address in Staten Island, New York pulled into the driveway of the Revere residence. After about forty minutes, the vehicle departed and traveled west toward Connecticut and New York on the Massachusetts Turnpike. Bregu was the driver and only occupant of the vehicle. Data from a pen register installed on Mario's telephone showed that approximately twenty-four minutes before Bregu arrived at the Revere residence, Mario received a short incoming call from the telephone number 609-510-5912, which was a prepaid cellular account without subscriber information. Toll analysis of the 5912 cellular telephone showed it had been used for contacts with Bregu's wife, Bregu's brother, and Mario.

In early February 2015, a confidential informant ("CI-3") with a history of reliable reporting told the FBI that Mario illegally sold pills to customers out of his residence. CI-3 also reported that Mario's son "Manny"—a known nickname used by Manuele—was selling illegal pills out of D&M. CI-3 reported that Mario's source for pills was an individual from New York. CI-3 advised that Mario received pill deliveries from his source on a regular basis.

Analysis of Mario's telephone activity and available pole camera footage revealed that a Town Car appearing identical to the vehicle observed on February 3 arrived and parked in the driveway of the Revere residence after a telephone call or calls from the 5912 number on other dates, including January 21, February 13, February 24, March 4, and March 10, 2015.

On February 27 and March 10, 2015, CI-3 made two controlled purchases of 30mg tablets of oxycodone hydrochloride pills from Mario inside the Revere basement.

B. Search Warrant Application for Vehicles[3]

On July 14, 2015, at 8:59 p.m. and 9:01 p.m., a magistrate judge issued warrants authorizing the search of Bregu's Town Car and Manuele's Tahoe on or before July 28, 2015, at any time in the day or night. The supporting affidavit for the vehicle warrants described the investigation into the defendants, which at that point involved surveillance, controlled purchases of oxycodone from Mario by a confidential informant, analysis of telephone records and pen register data for the defendants, and a series of search warrants to obtain precise location information from cellular telephones. Specifically, the special agent averred the following relevant facts:

---

[3] The warrant application also sought authorization to search the Revere residence.

CI-3, under the direction of agents, made multiple controlled purchases of oxycodone pills from Mario at the Revere basement. In addition to the controlled purchases previously described, CI-3 made controlled purchases on March 17, March 27, and April 13, 2015.

Agents observed Bregu visit the Revere residence in his Town Car numerous times during the investigation, including the times described in the previous warrant application and also on March 22, April 1, April 9, and April 15, 2015.[4] On each of those dates, Bregu arrived at the Revere residence and departed a short time later, usually within thirty to forty minutes. Precise location information obtained from a series of cellular telephones used by Bregu showed that Bregu traveled from New York, usually from his home in Staten Island, to the Revere residence and then back to New York after the meeting.

Pole camera surveillance showed that on most of the occasions when Bregu went to the Revere residence, Manuele appeared to attend as well. He left the second floor apartment of the Revere residence and walked towards the basement apartment following Bregu's arrival in the Town Car. He returned to the other apartment after the Town Car left. On February 3, 2015, agents did not see Manuele go to the basement but they did observe Manuele give Mario a shopping bag shortly before Bregu arrived. On February 13, before Bregu arrived, agents observed Mario going to the front door of the second floor apartment, where he appeared to receive a plastic shopping bag from an unobserved individual inside the apartment.

On April 19, 2015, activity captured by the pole camera indicated that the camera may have been detected. After that date, foot and vehicle traffic decreased dramatically, and on April 22,

---

[4] The affidavit also mentions February 15, but it appears that the special agent may have been referring to the February 13 visit previously described.

2015, CI-3 informed agents that Mario had obtained a new telephone and was temporarily reducing his drug activities.

However, it appears that drug distribution continued, albeit with a different manner of delivery. On April 23, May 3, and May 10, 2015, precise location information from Bregu's cellular telephone showed that Bregu departed Staten Island, traveled to the area of Revere and East Boston, and then returned to Staten Island. On these occasions, agents detected pen register activity between Bregu's cellular telephone and Mario's cellular telephone, and observed Manuele leave the Revere residence for a short period of time (usually forty-five minutes to an hour) and then return.[5] Agents observed Manuele carrying plastic bags from the residence to his red pickup truck, or from the Tahoe[6] to the Revere residence, or both.

On June 16, 2015, pole camera and pen register activity showed that Bregu's cellular telephone and Mario's cellular telephone were in contact twice. About an hour after the second contact, agents saw Manuele leave the second floor apartment at the Revere residence carrying a plastic bag and enter the basement. A short while later, Manuele, carrying the plastic bag, left the Revere residence. Mario then walked out of the basement, got into his car, and drove off. Ten minutes later, Mario's cellular telephone was in contact with Bregu's cellular telephone. Manuele then arrived home in the red pick-up truck about fifty-four minutes after he had left, carrying a bag or object under his arm, and entered the basement apartment. Ten minutes later, Mario and Manuele emerged from the basement apartment together. Around this time, agents began to notice increased foot and vehicle traffic consistent with street-level drug activity at the Revere residence.

---

[5] On May 10, 2015, agents had precise location information and pen register data but the pole camera was out of service.

[6] Manuele began driving the Tahoe shortly after June 16, 2015.

On July 7, 2015, pen register data showed that Mario's cellular telephone was in contact with Bregu's cellular telephone. At 11:39 p.m., Bregu called Mario. One minute later, Mario called Manuele. Five minutes later, Manuele left the Revere residence carrying something. He walked to the back of the Tahoe and moved items around in the back cargo area before driving off. He drove to the area of the D&M garage, where agents observed him meeting with Bregu in the Town Car. After about five to ten minutes, Bregu and Manuele left in their own vehicles. The Town Car followed the Tahoe as they drove for about fifteen minutes and ultimately pulled into a gas station in Revere. Video from that gas station's surveillance camera showed Bregu approaching Manuele as Manuele was pumping gas. Bregu pointed into the open driver's window and Manuele nodded his head. Bregu returned to the Town Car, removed a while plastic bag from the rear seat, and walked back to the Tahoe with the bag partially covered by a jacket. Bregu put the bag on the Tahoe's driver's seat and kept the jacket. After a few more minutes of conversation, both cars left. Manuele returned to the Revere residence. Pole camera surveillance showed Manuele exiting the Tahoe and entering the house carrying a white plastic bag, while agents followed Bregu to the Massachusetts Turnpike as he proceeded west toward New York.

The affidavit went on to state that on July 14, the date the government sought the warrant, agents had observed additional foot and vehicle traffic at the Revere residence, and pen register data showed Mario's and Bregu's cellular telephones in contact with each other on numerous occasions. Based upon the investigation and the activity on July 7-8, 2015, agents believed that Bregu may have been planning "to deliver additional oxycodone, even later tonight, and that the delivery is likely to take place in the evening hours, after 10:00 p.m." (Mot. to Suppress Fruits of Unlawful Searches & Seizures Ex. E Aff. ¶ 20 (dkt. no. 82-5).) The special agent averred that based upon the activity, agents believed that "during the time period authorized by the warrant,

7

BREGU will travel from New York to Revere in the Black Town Car and will be met by MANUELE SCATA in furtherance of their ongoing oxycodone trafficking conspiracy with each other and with MARIO SCATA," and that "when BREGU and SCATA meet, agents will search the Vehicles" for various evidence. (Id. ¶ 23.) The government therefore sought permission to search, in relevant part, the two vehicles at issue in this motion under the belief that they would "contain oxycodone, U.S. currency, cellular telephones used in the commission of the offense, and documents describing [the defendants'] drug suppliers and drug customers." (Id. ¶¶ 23, 30.)

**II.     Discussion**

The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A search warrant application must demonstrate probable cause to believe both that a crime has been committed (the "commission" element) and that enumerated evidence of that crime will be found at the place to be searched (the "nexus" element). United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (citing United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)). In determining the sufficiency of an affidavit submitted in support of an application for a search warrant, a magistrate judge makes "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The facts presented in the affidavit "need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). The issuing judge's probable cause determination is entitled to deference and will be reversed only if there is no substantial basis for it. United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005); see also Feliz, 182 F.3d at 86.

A. Bregu's Motion to Suppress

Bregu argues that the March 20, 2015, warrant for cellular telephone location data associated with the 5912 number was not supported by probable cause[7] and that fruits of that warrant, including the ensuing search warrants for cellular telephone location data and for Bregu's Town Car, must be suppressed. He further contends that even if the cellular telephone data is not subject to suppression, the search warrant for the Town Car separately lacked probable cause and its affidavit at most amounted to justification of a limited anticipatory warrant.

*i. Warrant Application for 5912 Number*

Bregu primarily contends that, although there may have been probable cause to believe that the Scatas were trafficking in oxycodone, the information linking him to that activity was too thin; it reflected mere contacts and interactions with people and places associated with the drug trade that could just as well have been innocent. Bregu, however, undervalues the details contained in the warrant application and the reasonable inferences drawn from it.

First, although the affidavit relies on information from confidential sources, the affidavit was sufficient under United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011). One informant, CI-1, identified Bregu by name, as well as another individual named Mino, as suppliers of oxycodone who delivered pills by vehicle from New York to Massachusetts. Kalligheri, who

---

[7] Bregu also contends more generally that the government may not obtain cellular site location information without a showing of probable cause and not by merely offering, for instance, "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records . . . are relevant and material to an ongoing criminal investigation" as set forth in § 2703(d) of the Stored Communications Act. See 18 U.S.C. § 2703(d). While I recognize that there have been substantial changes to cellular telephone technology since the Stored Communications Act was enacted approximately thirty years ago, see, e.g., Saved by the Bell: Day of Detention (NBC television broadcast Oct. 3, 1992) (Zack Morris's cellular telephone); Wall Street (Twentieth Century Fox Film Corp. 1987) (Gordon Gekko's cellular telephone), I need not decide now whether the government can obtain cellular site location information without showing probable cause in light of my conclusion that the government in fact met the higher standard.

admitted to selling pills such as oxycodone from Manuele's auto repair business and pled guilty to state drug charges, said that his supplier was Mino and that Mino's source for pills was located in New York. Telephone records showed that Kalligheri, Manuele, and Bregu had direct telephonic contact in the fall of 2013. Later, CI-3 informed the FBI that Mario sold pills from his residence and Manuele sold pills from D&M, and that Mario's source for pills was in New York and delivered pills to Mario on a regular basis. Additionally, CI-2 provided information that Mario had been illegally selling pills for years. The informants' tips were not from anonymous sources, but rather from confidential informants known to the FBI agent. He knew the identities of each of the confidential informants and met and debriefed each of them. Although CI-1's trustworthiness is undermined by his own later involvement in cocaine distribution, CI-2 was a local police informant and CI-3 was an open informant for both the FBI and state police and had provided reliable information to both in the past.

Second, the warrant application detailed other information from the investigation, including pen register and pole camera surveillance, that corroborated and supplemented the information provided by the confidential informants. Pole camera surveillance revealed activity at the Revere residence consistent with drug distribution activity. There was a high volume of traffic and many visitors stayed only one or two minutes before departing. Further, CI-3 himself made controlled purchases of oxycodone from Mario at the Revere residence.

Third, and significantly, surveillance revealed suspicious activity by Bregu that extended beyond merely visiting Mario's residence a "handful of times" as suggested by Bregu. (Bregu's Mot. to Suppress Fruits of Unlawful Searches and Seizures 12 (dkt. no. 82).) By the time the government applied for the warrant, the investigation had uncovered a pattern whereby Bregu briefly made contact with the Scatas through their cellular telephones, drove a car registered to

10

him at his address in New York and arrived at the Revere residence where drugs were sold, stayed for less than an hour, and then left, driving west on the Massachusetts turnpike in the direction of New York. The agent identified multiple occasions with similar meetings between Bregu and Mario at the Revere residence in a span of two months. Such information was consistent with CI-3's report that Mario received deliveries from his source in New York on a regular basis.

Considering the totality of the circumstances, I find there was substantial basis for the magistrate judge to have concluded there was probable cause to believe that evidence related to drug possession or drug distribution activity would be found by permitting the government to obtain the requested information.[8] See Ribeiro, 397 F.3d at 48; Feliz, 182 F.3d at 86.

    ii.    *Warrant Application to Search Vehicles*

With respect to the vehicle warrant, Bregu first argues that there was insufficient information to supply probable cause that Bregu's contacts with the Scatas were related to drug trafficking. Although the argument is not fully developed, he appears to contend that the affidavit failed to provide information linking Bregu's visits with criminal activity, as opposed to a social or some other purpose.

The argument is unconvincing. The agent's affidavit submitted in support of the search warrant documenting evidence collected during the investigation, including CI information and multiple controlled purchases of oxycodone, pen register and location data, observations from the pole camera, and the video surveillance of the gas station, was sufficient to justify issuing the search warrants. Specifically, agents had corroborated that the Scatas sold oxycodone by statements from the confidential informants and Kalligheri, controlled purchases, and observations

---

[8] Further, even if Bregu's argument had merit, the "good faith" doctrine announced in United States v. Leon, 468 U.S. 897, 923 (1984), would justify denial. See also Illinois v. Krull, 480 U.S. 340, 347 (1987).

of the foot and vehicle traffic activity consistent with street-level drug distribution; that the Scatas received their pill supply from an individual in New York; that Bregu made regular trips in his Town Car from New York to the Revere residence or to other locations in Revere and East Boston, staying for only short periods of time before returning to New York; that before the meeting Bregu's and Mario's cellular telephones were in contact with each other; that after meeting Bregu, Manuele was observed carrying plastic bags in connection with these meetings; and that on one occasion Bregu used his Town Car to deliver a bag, which he appeared to make efforts to conceal, to Manuele's Tahoe at a gas station.

Bregu next argues that the affidavit sought justification for what amounted to an anticipatory warrant, but the actual warrant requested and issued contained no constraints. While it is true that the warrant itself does not contain a statement of any particular limiting condition, the Fourth Amendment's "particularity requirement does not include the conditions precedent to execution of the warrant." United States v. Grubbs, 547 U.S. 90, 98–99 (2006). "For a conditioned anticipatory warrant to comply with the Fourth Amendment's requirement of probable cause, two prerequisites of probability must be satisfied." Id. at 96. "It must be true not only that if the triggering condition occurs 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' but also that there is probable cause to believe the triggering condition will occur." Id. at 96–97 (quoting Gates, 462 U.S. at 238). "The supporting affidavit must provide the magistrate with sufficient information to evaluate both aspects of the probable-cause determination." Id. at 97 (citation omitted).

The prerequisites for an anticipatory warrant for a search of Bregu's Town Car were satisfied by the supporting affidavit in this case. See id. at 96. A "practical, common-sense" reading of the application, see, e.g. Feliz, 182 F.3d at 86; United States v. Beckett, 321 F.3d 26, 31 (1st

12

Cir. 2003) (citation omitted), reflects that the relevant triggering event is an anticipated meeting between Bregu and Manuele. (See, e.g., Mot. to Suppress Fruits of Unlawful Searches & Seizures Ex. E Aff. ¶ 23 (averring that agents "believe that during the time period authorized by the warrant, BREGU will travel from New York to Revere in the Black Town Car and will be met by MANUELE SCATA in furtherance of their ongoing oxycodone trafficking conspiracy with each other and with MARIO SCATA").) The affidavit described the pattern that had emerged by that time of Bregu's travelling in his Town Car on a regular basis from New York to the Revere area to meet a suspected drug distributor and, after less than one hour, returning to New York. Separately, reliable information had indicated that the source for the drugs was from New York. Additionally, one surreptitious exchange between Bregu and Manuele was caught on video at a gas station and involved their use of their respective vehicles. The agent provided the necessary evidentiary link to support a probable cause determination that sometime within the two weeks following the warrant application, Bregu would be driving in his Town Car to meet Manuele for a transaction involving oxycodone and that once that triggering condition occurred, there was a fair probability that contraband or evidence of the crime would be found in the Town Car.[9] See Grubbs, 547 U.S. at 96–97.

> B. Manuele's Motion to Suppress

Manuele's arguments largely mirror Bregu's with respect his vehicle, the Tahoe. He contends first that the warrant is not an anticipatory warrant because it does not contain a description of the triggering event and that the application failed to establish probable cause that the items sought would be present in the vehicle at the time of the search.

---

[9] Additionally, although the warrant did not specify a condition, agents ultimately stopped Bregu in his Town Car after the triggering event had occurred.

Unlike Bregu's Town Car, Manuele's Tahoe was only described in the surveillance a few times. For instance, agents observed Manuele carrying plastic bags from the Tahoe to the Revere residence after meeting with Bregu, and video surveillance showed a suspicious transfer of a bag between the Tahoe and Town Car at the gas station meeting described above. Manuele argues that these incidents are too few to support probable cause to believe the Tahoe was a regular instrument of dealing and therefore a place where illegal drugs could be found.

This argument misses the point. It is not that the Tahoe was so regularly used to carry drugs that there existed a fair probability that at any given time a search of that vehicle would yield evidence of drug dealing. After Bregu stopped making deliveries at the Revere residence, the conspirators made other arrangements, which, observation indicated, included meeting at predetermined locations. At least sometimes, as the gas station incident indicated, they drove to those locations in their usual vehicles. As discussed above, there was ample probable cause to believe that when Bregu traveled from New York to Revere and environs, he was carrying drugs in his car for delivery to the Scatas. It was clearly reasonable to believe that once the delivery was made, the recipient, in the event Manuele, would be in possession of the drugs, and that if he was driving a car, the drugs would be with him in the car. This conclusion would not depend on whether that car had itself been used for prior drug transfers. When the transfer would occur in a mobile meet-up like the one observed at the gas station, the probable cause conclusion would apply to whatever vehicle Manuele was driving away in. Since at the time of the application Manuele was observed to be driving the Tahoe, it made sense for the affiant to aver that the Tahoe would be the transport vehicle Manuele was likely to use to meet Bregu and get the drugs.

Even if this analysis were to be mistaken, there is no basis for concluding that the executing officers' reliance on the warrant was other than in objective good faith, precluding suppression. See Leon, 468 U.S. at 923.

## III.    Conclusion

For the foregoing reasons, the defendants' motions to suppress (dkt. nos. 79 and 82) are DENIED.

It is SO ORDERED.

 /s/ George A. O'Toole, Jr.
United States District Judge