UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff | )<br>)<br>) |  |
| V. | )<br>)<br>) | CRIMINAL NO. 15-cr-10222 |
| ILIR BREGU,<br>    Defendant | )<br>)<br>)<br>) |  |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, Ilir Bregu, by and through undersigned counsel, respectfully submits this memorandum in aid of his sentencing scheduled for June 7, 2018.

I.     CALCULATION OF GUIDELINES

On Wednesday, March 7, 2018, Mr. Bregu was convicted of one count of Conspiracy to Possess with Intent to Distribute and to Distribute Oxycodone, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 846.

Mr. Bregu objects to the guidelines calculation in the presentence investigation report. Instead, Mr. Bregu asserts that the offense level should be calculated as follows:

Co-defendant Mario Scata testified that he began purchasing roughly 200 pills from Mr. Bregu, escalating to 1,700 pills for the last few trips.[1] Given the ambiguous nature of the testimony, there is no way to determine with certainty the number of pills at issue. However, a realistic, if not aggressive, estimate could be the following, regarding the 14 trips:

- First 2 trips at 200 pills each time = 400 total
- Then 4 trips at 500 pills each time = 2,000 total
- 2 trips at 1000 pills each time = 2,000 total

---

[1] The trial testimony is the best source of information for these calculations. In early April, 2018, Mr. Bregu's counsel mailed a motion to the court requesting the Court to authorize the production of a trial transcript without fee,

- 2 trips at 1200 pills each time = 2,400 total
- 4 trips at 1,700 pills each time = 6,800 total

Total Pills → 13,600 pills.

Calculation:
13,600 X 30(mg) = 408,000 mg → Converted to 408 grams X 6,700 (Marijuana conversion) = 2,733,600 → Converted to Kilograms = 2,733.6.  This puts Mr. Bregu at a level 30.

Mr. Bregu asserts that he should be granted a two-point reduction for his role as a minor participant, pursuant to USSG §3B1.2(b).  A minor participant is someone who is less culpable than the average participant in the offense, United States v. Brand, 927 F.2d 337, 228 (1st Cir. 1992) (unpublished), which the defendant must prove by a preponderance of the evidence. United States v. Melendez-Rivera, 782 F.3d 26, 28 (1st Cir. 2015).

The evidence in the instant case portrayed Mr. Bregu's participation in the conspiracy as minor, compared with his co-defendants, the Scatas.  A fair portrayal of the evidence against Mr. Bregu was that he was a delivery driver; a courier.  Mario Scata testified that Mr. Bregu delivered pills to him from New York.  No one – not even the FBI – alleged that the pills were originating from Mr. Bregu; in fact, there was absolutely no follow up in trying to locate the source of the pills at issue.  Certainly, they were not coming from Mr. Bregu's home.

Although the role of a courier does not *automatically* warrant a minor role adjustment, the District Court has wide discretion in making the determination.  United States v. Bravo, 489 F.3d 1, 11 (1st Cir. 2007).  Unlike the defendant in United States v. Santos, 357 F.3d 136 (1st Cir. 2004), who assisted in packaging and inspected the cocaine in addition to delivering the drugs, Mr. Bregu's alleged conduct does not involve anything other than making deliveries for the Scatas.  There was no suggestion at trial that Mr. Bregu was otherwise involved in any aspect of the drug business.

In contrast, Mario Scata admitted to actively selling many pills out of his home, and his son Manuele pleaded guilty not only to dealing drugs, but also illegally carrying a stolen firearm in conjunction with his drug operation. The FBI agents testified about extensive foot traffic in and out of the Scatas' home. While the Scatas seemed to bask in their drug profits, enjoying home ownership, a business, and trips to Las Vegas, Mr. Bregu lived the life of a pauper with his family in their Staten Island, New York apartment. The Scatas' participation in the conspiracy dwarfed that of Mr. Bregu. With the two-point reduction, Mr. Bregu asserts that his offense level should be 28.

II.     ARGUMENT

*An Advisory Guidelines Sentence Should Not Be Applied*

With regard to the United States Sentencing Guidelines, the district court, while not bound by them, still must consult and consider them when imposing sentence. United States v. Booker, 543 U.S. 220, 264 (2005). Courts of Appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. *See* Id. The United States Supreme Court clarified post-*Booker* sentencing procedure in Gall v. United States, 552 U.S. 38 (2007). The Gall Court indicated that when sentencing a defendant,

> [A] District court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing so, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance. We

> find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

552 U.S. at 49-50 (internal citations and quotation admitted). The Supreme Court re-emphasized the point stating. "[T]he sentencing court does not enjoy the legal presumption that the Guidelines sentence should apply." Nelson v. United States, 555 U.S. 350, 351 (2009) (*quoting* Rita v. United States, 551 U.S. 338, 351 (2007)). In fact, the First Circuit has summarized the central principles of the post-Booker and Gall sentencing procedure described above, as follows:

> In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent of that they are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."

United States v. Martin, 520 F. 3d 87, 91 (1st Cir. 2008).

    While the First Circuit has noted that sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance" from the advisory sentencing guideline range, it has also held that under a post-Gall rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion. Indeed, after Gall, the sentencing inquiry—once the court has duly calculated the guidelines sentencing range—ideally is broad, open-ended, and significantly discretionary. At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." Martin, 520 F.3d at 91-92 (internal citations and quotations omitted) (affirming a 91-month downward departure from the advisory sentencing guideline range).

Against this backdrop, Mr. Bregu respectfully requests this Honorable Court, after considering the advisory range, not impose a guidelines sentence in this case. Instead, he submits that a sentence of sixty months in prison, is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

*The Requested Sentence is Appropriate for Mr. Bregu in Light of the Various Factors Set Forth in 18 U.S.C. § 3553(a)*

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st. Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." United States v. Rodríguez, 527 F.3d 221, 228 (1st Cir. 2008) (citing Kimbrough v. United States, 552 U.S. 85 (2007)). That tenet -- the "parsimony principle" -- instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. (quoting 18 U.S.C. § 3553(a)). Accordingly, Mr. Bregu requests that this Court fashion a non-guidelines sentence based on his personal history and characteristics, family circumstances, nature of the crime and the purposes enumerated in the Sentencing Reform Act.

Mr. Bregu respectfully avers that an appropriate application of 18 U.S.C. § 3553(a) factors to the circumstances herein, should result in a sentence of sixty months in prison. The §3553(a) factors generally include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any

pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense 18 U.S.C. §3553(a).

## Nature and Circumstances of the Offense

The Guidelines, Chapter 1 Pt. A(4) explains that, "[t]he Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."

Undersigned counsel urges this Honorable Court to view this case, when fashioning an appropriate sentence for Mr. Bregu, as falling outside the "heartland" of a typical drug conspiracy case. Mr. Bregu's conduct involved transporting oxycodone pills from New York to Massachusetts, to Mario and Manuele Scata. From there, the Scatas actively sold those pills from their homes and business. Manuele even carried an illegal gun – illegal because it was stolen and illegal because he possessed no license. In short, he was a dangerous drug dealer. His father, Mario, testified that he hasn't worked since 1979. Although he claimed to have started drug dealing within the past several years, it defies common sense to believe that, having not worked since 1979, Mr. Scata picked up drug dealing in his 60's.

Unlike the active drug dealing of his co-defendants, Mr. Bregu's conduct is not that of a typical "drug dealer." Instead, Mr. Bregu worked long hours at legitimate construction and trucking jobs to support his wife and children. His wife, Enkelejda, works as a maintenance worker. The family lived in poverty, barely able to make ends meet, in a Staten Island apartment.

There is no allegation that Mr. Bregu engaged in any type of violence during the conspiracy. Nor did Mr. Bregu ever possess weapons. Instead, Mr. Bregu is before the Court as a first-time offender, facing the prospect of losing everything that matters in life: his family.

<u>History and Characteristics of the Defendant</u>

Mr. Bregu is a loving husband, father, brother, and son. He has a Criminal History Category of I, with no prior convictions. Prior to his arrest, Mr. Bregu was a hard working man; he worked in the construction business, and also as a truck driver with a CDL license, putting in long hours to help support his family.

Mr. Bregu was born and raised in Albania, one of four children to parents Neki Bregu and Shahe Mata. When he was only 17, Mr. Bregu's father passed away due to Leukemia. His mother, Shahe, still lives in Albania, although she and Mr. Bregu maintain a strong bond. She traveled to Boston to be present for her son's trial in March 2018. Mr. Bregu also continues to sustain robust and loving relationships with his siblings, especially his younger brother Elton, who accompanied Shahe to support Ilir at his trial.

While living in Albania, Mr. Bregu was a soldier in the military. He earned a precise sharpshooter award and was honorably discharged. Later, he received death threats due to political pressures in Albania, and sought asylum in the United States. He credits the United States with saving his and his family's lives. After arriving here, he sought to enlist in the United States Army to give back to his new country, intending to serve during our post-9/11 wars. However, he was denied due to his age and lack of documentation. He became a United States citizen on September 27, 2013.

Mr. Bregu and his wife, Enkejleda, have been married since 1995. Together, they have three children: Sandokan, 21, and twins Justin and Jessica, 9. The family lives in Staten Island, New York. Enkejleda works in the sanitation business as a custodial worker.

Mr. Bregu comes from a cultural upbringing that does not favor disclosure of addition or other personal issues. Despite a close relationship with his family, Mr. Bregu shielded them from his problems when he slipped into drug addiction. They were unaware until the instant case that Mr. Bregu had tried OxyContin in 2013 and spiraled to the point he was ingesting 10-12 30mg pills per week (around 3-4/day). Ironically, his arrest and subsequent case provided a jarring wake-up call for Mr. Bregu to become healthy again.

The worst punishment for Mr. Bregu is the knowledge that his family is suffering due to his actions. His children face the prospect of growing up without their father for a significant period of time. This is especially heartbreaking for Mr. Bregu, given that he lost his own father at a young age, and placed a special importance on being there for his kids. His wife is barely hanging on financially, with help from her brother-in-law, Elton. Although Elton has been doing what he can for his brother's family, it has become increasingly difficult for him to keep up with two households, as his own children and wife rely on his support. For someone who has consistently provided for his family as best he could, Mr. Bregu is depressed at the knowledge that he will be precluded from taking care of his wife and children while in prison.

<u>The Need to Avoid Unwarranted Sentence Disparities</u>

Every defendant who comes before this Court is different, so it is impossible to make exact comparisons. However, Mr. Bregu presents the Court with 13 recent examples of defendants who were found guilty of the same charge with which he was convicted, Conspiracy to Possess with Intent to Distribute and to Distribute Oxycodone, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 846:

| Defendant Name | Date of Sentence | Docket Number | Judge | Guidelines Range | Sentence Imposed |
|---|---|---|---|---|---|
| Gonzalez, Richard | 07/24/2017 | 4:16-cr-40036-TSH-2 | Hillman, J. | 21-27 Mo. | Time Served[2] |
| Difo, Melvin | 10/02/2017 | 1:16-cr-10347-DPW-1 | Woodlock, J. | 151-188 Mo. | 60 Mo. |
| Tautenhan, John | 09/01/2017 | 4:16-cr-40036-TSH-1 | Hillman, J. | 46-57 Mo. | 24 Mo. |
| Turner, Ashley | 12/19/2017 | 1:15-cr-10284-GAO-8 | O'Toole, J. | 41-51 Mo. | Probation |
| Vaughn, Eric | 09/18/2017 | 1:15-cr-10284-GAO-3 | O'Toole, J. | 63-78 Mo. | 24 Mo. |
| Romano, Joseph | 06/08/2017 | 1:15-cr-10284-GAO-1 | O'Toole, J. | 78-97 Mo. | 48 Mo. |
| Alonardo, Joseph | 05/16/2017 | 1:16-cr-10131-GAO-1 | O'Toole, J. | 24-30 Mo. | 18 Mo. |

---

[2] The docket reflects a time period of just over five months between arrest and sentencing hearing.

| Stevens, Kevin | 05/04/2017 | 1:16-cr-10131-GAO-2 | O'Toole, J. | 12-18 Mo. | Probation |
| Milbury, Marcelle | 01/05/2017 | 1:15-cr-10284-GAO-7 | O'Toole, J. | 24-30 Mo. | 12 Mo. |
| Delgado, Johnny | 03/15/2017 | 1:16-cr-10138-DJC-1 | Casper, J. | 24-30 Mo. | 24 Mo. |
| McPherson, Jonathan | 11/22/2016 | 1:14-cr-10211-WGY-1 | Young, J. | 37-46 Mo. | 10 Mo. |
| Purcell, Marva | 06/28/2016 | 4:15-cr-40011-TSH-5 | Hillman, J. | 151-188 Mo. | 55 Mo. |
| Williams, Voncille | 05/31/2016 | 4:15-cr-40011-TSH-4 | Hillman, J. | 46-57 Mo. | 12 Mo. + 1 day |

As to the defendants above, the average sentence is just over 22 months. Even if the probation and time-served cases are removed from the calculation, the average sentence of the 10 recent cases becomes 28.7 months. Against this backdrop, even Mr. Bregu's suggested sentence of 60 months is more than double the average sentence for similarly situated defendants in this District. It is important to remind the Court that Mr. Bregu has no criminal history, so there is no defendant there with a better record listed above, and some with worse records.[3] Again, Mr. Bregu comes before the Court with no prior convictions except for the instant case, a non-violence drug crime. Mr. Bregu urges this Court to acknowledge that for a significant time during the pre-trial stage, he was under strict conditions of release, including house arrest for the last 4+ months leading to trial.

A guidelines sentence in this case is too much. Instead, a terms of sixty months – five years – is a lengthy sentence which is "sufficient, but not greater than necessary" for Mr. Bregu.

III.   CONCLUSION

Mr. Bregu respectfully requests this Honorable Court to impose a non-guidelines sentence of sixty months in prison.

---

[3] Out of the 13 defendants listed, six fell into a higher criminal history category. The following were at a level II: Gonzalez, Turner, Vaughn, Romano, and Purcell. Difo was at a level VI.

                    Respectfully Submitted
                    For the Defendant,
                    ILIR BREGU,

                    /s/ Joseph B. Simons
                    Joseph B. Simons, MA BBO #684030
                    Sara Attarchi, MA BBO #697486
                    Simons Law Office
                    1 International Place, Suite 1400
                    Boston, MA  02110
                    (617) 292-6260

Dated:  June 3, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 3, 2018.

                    /s/ Joseph B. Simons
                    Joseph B. Simons